## GLEASON v. MASSACHUSETTS MUT. LIFE INS. CO. et al.

### No. 4598.

District Court, N. D. Ohio, W. D.

Feb. 10, 1942.

Kerns Wright, of Van Wert, Ohio, for plaintiff.

George Effler, of Toledo, Ohio, for defendants.

KLOEB, District Judge.

This is an action by plaintiff to recover on a life insurance policy issued by the defendant, Massachusetts Mutual Life Insurance Company, upon the life of Clarence Burdette Todd. The administratrix of the estate of Clarence Burdette Todd was joined as a defendant but upon motion of the defendant company was dismissed by the Court.

The case is submitted upon a stipulation of facts, objections as to the relevancy of certain stipulations (which the Court sustains as to paragraphs ten and twelve of the stipulation of facts and overrules as to paragraphs nine and eleven), the depositions of plaintiff, plaintiff's daughter, the administratrix, and Irl Jackson, a general agent of the defendant company.

The policy was issued on December 4, 1936. The face amount was $7,000 and the semi-annual premiums were $98.63. On December 19, 1936, the policy was assigned by the insured to plaintiff as collateral security for a loan of $6,500, which was evidenced by a promissory note signed by Todd. The first premium was paid by the insured on December 4, 1936, the day the policy was issued. He also paid the next semi-annual premium on June 4, 1937. On December 15, 1937, after receipt of notice of premium due, he notified the defendant company, through its agent, that he would not pay the premium on said policy due December 4, 1937, for the reason that he was replacing it with insurance with the Ohio State Life Insurance Company, which company he was then representing as agent.

The insured, Clarence Burdette Todd, died on October 23, 1941. Shortly thereafter plaintiff notified the agent of the defendant company of the death of the insured and was informed that the premiums maturing on December 4, 1937, and thereafter had not been paid. This was the first time she knew of non-payment. She had never requested that notice of premiums due be sent to her, and the proofs establish the fact that no notices were ever sent to her.

The assignment of the policy by the insured to plaintiff was made on a "collateral assignment" form furnished by the defendant company and a copy thereof was filed with the defendant company on December 24, 1936. Plaintiff claims that by virtue of the filing of said assignment with the defendant company, the latter was bound by Section 9371, Ohio General Code, to send the premium notices to her. That statute reads as follows:

"Statement as to tontine policy. Any such company issuing policies on tontine or semi-tontine plan, or which claims to be mutual as to its profits to residents of this state, after the payment of the first premium thereon, and not more than sixty days and not less than ten days prior to the maturity of each and every premium, thereafter in writing shall notify every such policy holder, namely the person whose life is insured or the assignee of such policy, if the company has been notified of its assignment, and the address of the assignee given residing in this state, of the time of payment of such premium. Proof of the depositing of the notice to the policy holder or assignee in the post-office by the company or its agent, postage prepaid to the last address as given by policy holder or assignee to the company, shall be conclusive proof of its service. Such notice shall set forth fully the amount of the dividend belonging to the policy, when requested by the policy-holder if it be a participating policy, and at the end of the tontine or semi-tontine period of each policy, the company issuing it shall make a statement to the policy-holder of all the dividends and profits accruing thereon, and from what sources they have been derived."

In view of the fact that plaintiff relies upon the provisions above set forth in claiming a legal responsibility upon the part of defendant company to send her semi-annual notices of premiums due, it behooves us to examine and analyze the provisions of this section. It is plaintiff's contention that the underlying reason behind the enactment of this section, or one of the reasons, was the desire of the legislature to protect the interest of a possible assignee of a policy. Let us see what the statute says, in an effort to arrive at the intent of the legislature in its enactment.

The statute begins by saying, "Any such company," thereby meaning any legal reserve life insurance company organized by Act of Congress or under the laws of any other state of the United States than the state of Ohio. The statute then continues, "issuing policies on tontine or semi-tontine plan, or which claims to be mutual as to its profits to residents of this state." It is significant that the statute applies, not

to all legal reserve life insurance companies foreign to the state of Ohio and doing business therein, but only to those companies that are engaged in issuing policies on the tontine or semi-tontine plan, or those companies which claim to be mutual as to their profits to residents of the state of Ohio. If it was the intention of the legislature to protect the interests of a possible assignee of a life insurance policy, then the assignees of policies issued by stock life insurance companies were denied protection.

Why should the legislature desire, in the early days when this statute was enacted, to lay down a requirement of companies issuing policies on the tontine or semi-tontine plan or those companies that claimed to be mutual as to profits? It must be assumed that some motivating reason existed, that some existing evil was sought to be corrected, and that the lawmakers were taking steps by way of the enactment of this statute to correct an evil; and the evil apparently was confined to those companies that were issuing policies on a tontine or semi-tontine plan or that had mutual profits for distribution.

In the Seventeenth Century, a Neopolitan nobleman by the name of Tonti was engaged in the banking business and he devised a scheme whereby certain classes of depositors pooled their earnings which were to be divided at stated periods in the future, of say five, ten or fifteen years, among the survivors. Those who died or lapsed their payments in the interim, or the beneficiaries of those who died, lost all claim to the increments on the deposits. In some instances the principal of lapsed members was also forfeited to the survivors. Hence the name "tontine" which implied a deferred payment.

At and before the time of the enactment of Section 9371, the issuance of life insurance policies on the tontine or semi-tontine plan was quite common. Let us assume that in the year 1900, 100,000 individuals insured their lives in a company and that they all selected a particular dividend distribution period, say in fifteen years. All gains and savings accumulating to the policies of this class during the fifteen years were set aside and accumulated to their credit. By gains and savings on a policy, we mean gains and savings from the only two sources from which they could accrue, i. e., savings on interest and savings on mortality. The beneficiaries of

the members who died during the fifteen-year period received payment of the face value of their policies, and lapsing or withdrawing members received such surrender values as might have been stipulated in the contract or required by law; but in either case the interest of such members in the gains or savings that might have accrued up to the date of death or withdrawal was forfeited to the remaining members of the class, among whom they were accordingly distributed at the end of the stipulated period. This was the semi-tontine plan. It implied the accumulation of gains or savings for the benefit of a particular class, and involved the forfeiture of the gains of the members of the class who died or withdrew during the period, for the benefit of those who lived or persisted to the end.

Tontine distributions differed from semi-tontine in that not only the gains or savings of the lapsing members were forfeited, but their reserve as well. The beneficiary of those who died received payment of the face value of their policies, but those who lapsed or withdrew before the end of the tontine period received nothing, no surrender values being allowed. To the credit of the lawmakers of the various states of the Union, as well as the press of competition among life insurance companies, it may be said that semi-tontine and tontine plans of life insurance are no longer written in this country.

One of the substantial avenues of profit for a life insurance company issuing policies under the tontine or semi-tontine plan was to invite or induce the unwary policy holder to lapse in the payment of a premium through failure to give him any notice that it was about to become due. Mutual life insurance companies would accumulate a far greater number of lapsed reserves and perhaps might be unfair in their distribution of accumulated surpluses to the policy holder who persisted if they failed to give any notice of the due date of a premium or of the amount of the dividend that the policy holder had to his credit for distribution.

This constituted an abuse against the public by the life insurance companies. The public was helpless, but the lawmakers could correct the abuse. The result was the statute quoted above. It provides that after the payment of the first premium on a policy any company foreign to the state of Ohio and doing business therein which

is a legal reserve life insurance company and issuing policies on the tontine or semi-tontine plan or which claims to be mutual as to its profits, shall, not less than ten days nor more than sixty days prior to the maturity of each and every premium, thereafter in writing "notify every such policy holder, namely the person whose life is insured or the assignee of such policy, if the company has been notified of its assignment, and the address of the assignee given residing in this state, of the *time* of payment of such premium." (Italics added)

Now what further is required of such insurance company? It is required further to set forth in the notice "the *amount* of the dividend belonging to the policy, when requested by the policy-holder if it be a participating policy, and at the end of the tontine or semi-tontine period of each policy, the company issuing it shall make a statement to the policy-holder of all the dividends and profits accruing thereon, and from what sources they have been derived." (Italics added)

■ It thus appears that the primary purpose of this statute was to require a written notice of the time of payment of a premium and the amount of the dividend, together with a statement of dividends and profits accruing on the policy at the end of the tontine or semi-tontine period. It does not appear that an intent or purpose existed to protect the financial status of an assignee. This analysis is strengthened by the very title which the legislature gave to this section, "Statement as to tontine policy."

■ Assuming now that the purpose was to require written notice in order to correct the evil of lapsing insurance, of what avail would it be if notice be sent to a policy holder who had made an unconditional assignment of all his right and interest in the policy to an assignee, and the latter had assumed the payment of the premiums? A written notice to the policy holder would be a futile thing and equivalent to no notice at all, thus eradicating the good which was sought to be accomplished through the enactment of the statute. If the policy holder assigned his policy to an assignee as collateral security for the payment of money owing, then he would, except as an unusual matter, continue to pay the premiums when due. He would retain that responsibility. Being the responsible party, he should receive a written notice.

The statute requires but one notice, and a life insurance company has discharged its duty under the statute when a written notice, drawn in conformity with the requirements of the statute, has been mailed. If it should mail such a notice to a collateral assignee, the policy holder retaining the duty of meeting the premiums when due, and because of failure to receive such a written notice the policy holder lapsed in the payment of his premiums, then certainly the insurance company has not measured up to the legal requirements. If, on the other hand, the assignee is an unconditional assignee and assumes the responsibility of meeting the premiums when due, but the insurance company mails its notices to the policy holder, then again it has failed to give a written notice as required by law and may be held responsible if through failure to receive notice the party charged with the duty of meeting the premium fails to do so.

■ It is my opinion that although the use of the disjunctive "or" renders the meaning of original Section 9371 somewhat ambiguous, yet upon consideration of the intent and purpose of the statute one must come to the conclusion that the sensible interpretation is to require the insurance company to mail its written notice to the person upon whose shoulders is cast the responsibility of meeting the premiums when due.

It is commonly understood that where an assignment is made as collateral security for the payment of a debt, and the assignment bears such a title as it did in the instant case, that the assignor retains some rights and privileges in connection with the assigned article. Having retained some rights or privileges or both, he retains the duty of maintaining life in the body of the assigned article, unless some statement to the contrary is made. On the other hand, where the assignment is unqualified and absolute, the assignee is the party who acquires and maintains the sole interest in the assigned article and it may reasonably be assumed acquires the duty of maintaining the life in that assigned article.

■ The court is strengthened in this view after reading the amended Section 9371, of which the Court takes judicial notice, and which became effective September 5, 1941. This amended section reads as follows: "Premium notice to policyholders; proof of service; annual dividend notice; exceptions. Every such life in-

surance company, after the payment of the first premium, and not more than sixty days and not less than ten days prior to the maturity of each and every subsequent premium, shall give notice in writing of the time of payment of such premium to the person whose life is insured or to such other person as may be the assignee or the owner of the policy, provided such other person is to pay premium for such insurance and is a resident of the state of Ohio, provided the company has been notified in writing of such assignment or ownership and the address to which notices are to be sent. Proof of the mailing of the notice to the policyholder, assignee, or owner by the company or its agent, to the last address as given by the policyholder, assignee or owner to the company, shall be conclusive proof of its service. Such notice shall set forth the amount of the premium, and if a participating policy, where dividends are being used to reduce the amount of the premiums, the net premium. Annually notice shall be given if dividends are being allowed to accumulate at interest; or if dividends are being used to purchase paid-up additional insurance. This section shall not apply to group insurance, or to monthly or weekly premium insurance."

It will be noted that the amended section begins by saying, "Every such life insurance company" (meaning foreign life insurance companies doing business as a legal reserve company), and it does not confine the effects of the statute to companies doing business on a tontine or semi-tontine plan or to mutual companies. It says "Every such" company. And then after directing that notice be mailed to the person whose life is insured, it says, "or to such other person as may be the assignee or the owner of the policy, *provided such other person is to pay premium for such insurance.*" (Italics added) It appears to me that the legislature has clarified the statute by inserting in it what was implied and meant but not said in the original enactment of the statute, i. e., that notice should go to the person whose duty it remains, or becomes, to pay the premium.

Counsel for plaintiff, conceding that there is no case law in Ohio bearing directly upon an interpretation of Section 9371, calls particular attention to the position taken by the state of New York in the case of Strauss v. Union Central Life Insurance Company, 33 Misc. 333, 67 N.Y.S. 509, where the court held, in the case of a statute written in the alternative as between policy holder and assignee as in the Ohio statute, that it became the duty of the insurance company to notify the assignee of a policy and that failure to do so would be disastrous for the company.

Upon reading this case my attention is immediately called to the following, "It was issued by the company through its general agent in the city of New York to Isaac Levy on August 15, 1893, and assigned by him to the plaintiff on September 16, 1893, *by a written assignment absolute on its face.*" (Italics added) But aside from the absolute assignment that obtained in connection with this policy, the court seems to have referred in two instances and to have placed great stress upon the fact that after the original enactment of the statute in 1876 it was amended in 1877 "to the effect that such notice should be mailed to the insured, 'or the assignee of the policy, if notice of the assignment has been given to the company'"; the court further called attention to the fact that this amendment "was substantially incorporated in section 92 of the insurance law passed in 1892." Further along in the opinion, Judge Gaynor says, "The first statute on the subject prescribed a notice to the insured only, as we have seen. What is the meaning of this addition, by amendment, 'or the assignee of the policy'? Its object could only have been to protect the assignee."

It appears that Judge Gaynor was substantially influenced in the conclusion that he arrived at through a perusal of the legislative history of the statute and we have no such history in the state of Ohio. Likewise, the New York statute was not limited to a particular form or forms of life insurance policies, but included all types.

█ In the case before us the plaintiff testified that she knew Todd "ever since he was a little boy." She had complete confidence in him. She trusted him implicitly. She took the policy for $7,000 as collateral assignment for security on a note for $6,500 given by Todd to her. It was a three-year note. She paid no attention to the policy nor to its provisions. One semi-annual premium was paid by Todd after she had received the assigned policy and she received no notice from the company of the due date of this premium. Substantially three years elapsed after Todd had failed to meet the next semi-annual premium and before his death. It was not

until after his death that she complained and sought to hold the insurance company for its failure to send her a notice. It appears to me that she had utter and complete confidence and reliance in Todd, and that in the absence of a statutory duty imposed by law upon the insurance company to give her a written notice that she has no just cause against the company for failure so to do. I find no statutory duty herein.

Therefore, judgment is for the defendant insurance company with costs.

The defendant may have ten days in which to file findings of fact and conclusions of law in accordance with this opinion and plaintiff may have ten days thereafter in which to file her objections and suggested additions.